Good morning, Your Honors. May it please the Court, Michael Senator for the Petitioners. Now, if I could, I'd like to reserve five minutes of my time. I'd like to address initially what I think is the primary issue in this case, which is the adequacy of the Fish and Wildlife Service's biological opinion upon which the Environmental Protection Agency relied in transferring the 402 permitting program to the State of Arizona. Your Honors, with respect to the BO and EPA's reliance... Give us some idea. What other issues do you plan to discuss? What I would like to address is the issue concerning whether or not EPA's action was discretionary, whether or not they actually had an obligation to consult. The federal government has actually disavowed that argument in this case. So I think to the extent that... They disavowed it or simply have said that we don't need to reach it on their view because on their view they did adequately consult. I'm sorry, Your Honor? I didn't quite understand to be disavowing it as much as simply saying that we don't need to reach it, on their view of the case. Well, that's right, because that was not the basis upon which they completed. The fact of the matter is EPA did consult. And I don't want to speak for the government, but I think what the government is effectively saying is that this case is a straightforward administrative review case. All right. But you're going to address that question. Right. And then what I would like to do is to address the issue that the interveners have largely raised, which is from their standpoint EPA had no obligation to consult. You know, there are two facts in this case which really are not in dispute. First of all, on the basis of this record, it's clear that Section 7 has, in fact, greatly benefited enlisted species in Arizona through the Section 7 consultation process that EPA engaged in when it administered the 402 program. And, in fact, the biological opinion itself makes clear that, for example, it talks about the amount of habitat that's been conserved through that process for the cactus, Virginia's pygmy owl, the puma pineapple cactus. There's also evidence in the record that it's had a benefit for other species, southwestern little flycatcher, for example. The second issue that's not in dispute is once that program was transferred, those Section 7 protections, those benefits were lost. Now, there's obviously a dispute as to whether or not the loss of those protections was actually an effect of EPA's action, but there is no dispute that those protections have, in fact, been lost. And that's because it's EPA's position that once the program is transferred, it no longer has an obligation to consult with the Fish and Wildlife Service regarding state-issued NPDES permits. I mean, you're not challenging that here. We changed some oversight, though, isn't that right? That's right. But what I'm saying, it's EPA's position, however, that they, in fact, do not consult on state-issued permits. Now, to the extent that – now, I actually think that's an open issue here, but it's not an issue before this Court. I would say that to the extent EPA actually exercises that oversight authority and therefore federalizes permits, the Section 7 obligation would consult. And I'm not sure EPA would dispute that. But from the standpoint of to the extent the state is actually issuing permits, unless EPA actually exercises that oversight authority, they will not – they will no longer consult on those permits. They have this MOA, which seems to have some sort of consultant-like provisions. The MOA? Yes. That's right. And actually, I think if I could address that, I think the MOA is actually relevant from the standpoint of the issue, again, that the interveners have raised, which is the assertion that EPA, in fact, has no discretion here. In fact, I think the fact that, as you pointed out, they have this MOA is at least some indicia that they, in fact, do have discretion to do something. I mean, the fact of the matter is the MOA was put in place to address listed species impacts once the program was transferred. It's our position that MOA does not go far enough, but the fact is that at least there's some evidence they do have some discretion to do something. So faced with these two facts, in essence what the biological opinion fails to do is to, in any meaningful way, actually address or analyze the impacts of losing those protections on listed species and critical habitat. As we pointed out in our briefs, EPA initially consulted on – The biological opinion seemed more like a legal opinion. I mean, they were basically saying that because of the relationship between the consultation on the transfer and the endangered species, that there wasn't a relationship that was cognizable under the statute. Wasn't that mostly what they were saying in the biological opinion? Well, coming back to the statute, the statute is clear. What it says is agencies will consult on any federal action. The fact of the matter is, again, it was EPA's position, at least coming into this case, that this was an action that they needed to consult on. Once that consultation was initiated, it was the Fish and Wildlife Service's obligation to analyze all effects, including indirect effects. And the fact of the matter is, again, there is no dispute that those Section 7 protections were lost as a result of EPA's action. Now, I think the point Your Honor raised, that there was some attempt to offer a legal analysis as to why those loss of protection did not need to be analyzed, I think they attempted to offer a legal explanation. But the fact of the matter is, the BO itself simply does not make any sense. There's no statutory basis or regulatory basis for that conclusion. And if I could, Your Honor, the fundamental argument that the BO makes is that we simply don't know what the effect of losing these protections will have on listed species. Well, to the extent that's true, to the extent that, as the BO argues, it's simply speculation, it's reasonably uncertain as to what those effects will be. As the Supreme Court held in TVA v. Hill, to the extent there was uncertainty, the benefit of the doubt in that case should have gone to the species. And instead what we have is the biological opinion doing the exact opposite, which is there's some uncertainty here, we don't really know what's going to happen, but we're going to come down on the side of actually transferring the program and we're not going to make any meaningful attempt to actually grapple with what impact this could have on listed species. To the extent that the BO discusses, and again I — Let me just ask a question, at least it's clarifying to me. For the most part, the permitting that's being transferred is permitting with regard to construction runoff. Is that right? Well, not exclusively. Well, not exclusively, but for the most part. Well, I think the BO dealt mainly with that issue. But the reason it seems to me that that matters is because one of the challenges that's being made is that the effect — first there's the transfer, and then there's the — but even if you get to the permitting, that is too indirect because the permits themselves are not allowing any project or not allowing any project. Well, that's not entirely correct. I mean, I — I'm not saying that's correct. Right. I'm saying that's the challenge that's being made. In other words, that the argument is that these effects don't have to be accounted for because they don't deal with any endangered species effect of the water runoff itself, but of the construction. Well, just focusing on that issue, I think it's helpful to, again, step back to look at the Fish and Wildlife Service's regulation regarding indirect effects because, I mean, it's fundamentally the loss of being able to address those and other impacts that the Fish and Wildlife Service and EPA failed to address. The Fish and Wildlife Service's regulation on indirect effects is sufficiently broad to cover just those types of non-water-related impacts. And the fact of the matter is EPA routinely consulted with the Fish and Wildlife Service when it was actually administering the program, as the biological opinion itself points out. And, in fact, there was a national consultation which specified that EPA does, in fact, consult on non-water-related impacts. So the fact of the matter is that we had an agency that was routinely consulting, as the Fish and Wildlife Service's regulations require, on, for example, housing and commercial and residential development projects. Secondly, as a legal and both practical matter, the fact is that construction general permit authorizes stormwater-related runoff, but in the context of construction activities. So it does, in fact, authorize those activities. And that was really my point. It seems to me that it's not particularly indirect. It is directly authorizing the construction itself. Well, that's right. Really, because you can't have the construction without the runoff. No. And the fact of the matter is you cannot move forward with your, if it's over an acre now, you cannot move forward with your construction project without getting now a permit from the state. Previously it was from EPA. Can I suggest that you get to the other question, i.e., why was this a discretionary? Was it discretionary? And also, are you going to address at all the validity of the regulation that says it has to be discretionary? Sure. The interveners have made the straightforward argument that essentially EPA had no obligation to consult because this was a nondiscretionary duty. The government makes what is tantamount to the same argument, which is that although EPA consulted, EPA's action was not the cause of those effects, and they attribute that to Congress in essentially authorizing this transfer. At the end of the day, the result is the same, which is, and I think this is critically important, essentially what this argument says is that even if EPA had made the determination that transferring this program would actually result in the extinction of listed species, EPA had no other obligation. So where are you finding their discretion to do something about this? I'm having a hard time with this because the statute, the CWA, does say shall, and it has a list of criteria, and this isn't one of them. So is your argument that this is discretionary, nonetheless, in the sense that the Environment and Species Act is a trump so that it always is a factor? Or is it that it doesn't matter whether it's a trump or not because they at least have to do the consultation? That seemed to me to be the thrust of your earlier argument. They at least have to do the consultation because they may be able to come up with something that they don't have to do but they can do, such as this MOA. Or what exactly is your argument? Well, our primary argument, if at the end of the day, the determination is made that this action would result in the extinction of listed species, we think the plain language of Section 7 is clear. The Supreme Court has answered this question, TBA versus HILC. Regulation is invalid insofar as it says discretion. Well, the plain language of the statute doesn't say anything about discretion or non-discretion. I mean, the fact of the matter is, notwithstanding the Fish and Wildlife Service's regulation, there is no exemption under Section 7. Notwithstanding has to mean it's an invalid regulation. Well, yeah. I mean, that's essentially what we've. Or does it mean something else? Does discretion mean something other than what one usually thinks it means? Well, to the extent that that regulation would allow EPA, again, to transfer this program and then cause the extinction of listed species, that regulation is flatly inconsistent. All right. So do you have an argument that under the regulation, that would avoid us having to deal with the validity of the regulation and explains why even assuming the validity of the regulation, the transfer issue was still consultable under the environmental. Yes. And if I could just briefly address the second issue, which is a related issue, which is to the extent there's a conflict between these two statutes. As we pointed out in our briefs, putting aside for a moment whether or not that argument makes any sense under the Endangered Species Act, it also makes absolutely no sense under the Clean Water Act. I mean, the goals and the purposes of the Clean Water Act, one of the goals is to restore and maintain the biological integrity of our nation's waters. It makes absolutely no sense to argue that Congress intended EPA to actually undertake an action that would result in the extinction of listed species, which is flatly inconsistent with the purposes of the Clean Water Act. So I think the system — So you have — the particular section of the Clean Water Act is what, 1536? Right. And it says that EPA shall transfer authority to the states if the states meet the following criteria. There's a whole bunch of criteria. They're not that specific. I mean, there may be some discretion as to how you apply those criteria. But none of the criteria is an Endangered Species Act criteria. So what — and then we also have the Fifth Circuit opinion, which says that the agency could not make one — add a criteria, which is the Endangered Species Act consideration. So do we have to disagree with the Fifth Circuit to reach the conclusion you're asking us to reach, or what? Well, I certainly think you should disagree with the Fifth Circuit. I mean, the fact of the matter — Well, explain to me exactly why they're wrong, then. I'm having trouble. Well, I'll point out exactly why they're wrong. Let me read to you from that opinion what — and this was essentially the basis for the opinion. And I'm quoting. I'm reading from that. It is — It's actually page 298. I think it's subsection D. Subsection D? It's 5D. Roman numeral 5. Roman numeral 5. D. D as in boy. D as in dog. D as in dog. Right. Yeah, that's correct. Tell me about that. It says, That is flatly wrong. It's not only inconsistent with the plain wording of the statute. It's inconsistent with what the Supreme Court held in TVA v. Allen. It's also inconsistent with this circuit's precedent. Section 7 imposes both procedural and substantive obligations on Federal agencies. So the statement that it confers no substantive powers is simply wrong. But then what you're necessarily arguing was that the — which may be valid, but I have a hard time reconciling it with the regulation, is that the Endangered Species Act added a criteria to the listed ones with regard to the transfer and said that not only do you have to take into consideration everything that's here, but you also have to take into consideration whether the transfer is going to endanger species. And so you're saying that the Endangered Species Act is essentially an additional factor for every government decision, whether the governing statute says so or not, which is not an implausible conclusion. Yes, yes. But it's not, as I understand it, the way — what the regulation says. No, that's right. That's right. And I think the regulation, again, is inconsistent with the statute and is inconsistent with — So what I'm trying to really ascertain is, is that really the core of your position, or is there an argument that you have that would not — which would be consistent with the regulation and yet would reach the result that you want to reach? Well, I think there's two answers. One is, I think, again, you've got to come back to the Clean Water Act, which is, is there really a conflict between the Clean Water Act and Section 7? Well, as I said previously, I don't think there is. If you read the Clean Water Act — I'm reading that particular section, not in general, 1536, and it says that the EPA shall approve an application of a state to do the permitting if X, Y, and Z. And it doesn't have Q, or it doesn't have Z prime, which is the Endangered Species Act considerations in there. So where is it coming from inside the CWA, which is what you seem to be saying? Well, let me try to address it this way. I think that question would be easier to answer if we actually had — if the agencies had actually gone through a meaningful consultation. What the interveners have argued is essentially this was a black or white. They argued that EPA either transfers the program or they deny it. And they argued they couldn't deny it because they couldn't do so on endangered species grounds. Well, what we don't know, because the agencies didn't complete an adequate consultation, we don't know whether at the end of that process there were actually things that EPA could do, consistent with its Clean Water Act authority, to actually avoid causing species to go extinct. So this argument is really one of the varieties I was suggesting before, which is that there may be a consultation obligation even if there isn't a substantive obligation. Well, again, there clearly is a substantive obligation. But I think what you may be getting at is — and this may be a matter of where you focus in terms of discretion. I mean, again, if EPA could actually transfer the program and undertake reasonable and prudent alternatives, which Fish and Wildlife Service would have been required to propose at the end of the consultation process, EPA very well — we just don't know because this was a truncated consultation process. They could have gone ahead and transferred and there would be no conflict. If at the end of the day there are no reasonable and prudent alternatives, there's nothing EPA can do to avoid jeopardy. Then again, I come back — But what would be an example of a reasonable and prudent alternative other than, say, the MOA kind of thing that they did do that would be consistent? If you read the CWA as it appears on its face to say if X, Y, and Z you have to transfer, if X, Y, and Z are true, what could EPA do other than transfer? Well, I don't know. I mean, as I mentioned earlier, EPA does retain oversight authority. I'm not prepared here to tell you what the extent of that oversight authority is, but it's our position that they actually do retain, again, some obligation post-transfer to exercise that authority in a way that would address listed species impacts. The second issue, which is in some ways a similar issue, EPA is funding Arizona's program, I think roughly to the tune of about half of what the program is going to cost to run. Where is that funding provision in the statute? Is that discretionary, how much money they give? I believe it's discretionary. I'm not real familiar with the program, but the state, I believe, applied for a grant, an EPA grant. Is that discretionary? Could that be the answer to where the discretionary is? Well, yes, it is. Well, in fact, the Fish and Wildlife Service asked EPA to not only consult on the actual transfer, but to also consult on the fact that they were going to continue to fund this program after the transfer was made. So, again, I don't subscribe to the notion that, at least from the standpoint of not having the discretion to do anything, I'm not sure we can answer that question here. Let's be specific. What did they have the discretion to do? I don't know, Your Honor, the full extent of their discretion. Well, how can we decide that? Start with not the full extent. Start with what you do know. Well, Your Honor, they could certainly enter into an MOA with EPA that would actually have a meaningful impact on the ground. Again, it's our position that they could not as a condition of the transfer, but simply because they could induce Arizona to be good guys and to do it. Well, I think the problem with what the Fifth Circuit had with what they did there was basically what EPA said to the State of Louisiana is you will consult with the Fish and Wildlife Service. I don't see any reason why EPA couldn't transfer the program, then enter into a separate arrangement with the Fish and Wildlife Service that lays out how they're actually going to I mean, this is not a situation where It wouldn't be a condition of the transfer, but it would simply be an agreement between two sovereigns that this is how we're going to operate. Right. And, again, it is not a situation where EPA transfers the program and then they just simply walk away from it. It's important to state that we are not interested in any of your agreements. Go take them. Then what? Well, I'm not sure to what extent if EPA and the Fish and Wildlife Service entered into an agreement. Again, they've done so in a general sense under this national MOA. I'm not sure to what extent the state could actually object to that. All right. We're over time already, so thank you. Thank you. Thank you. And please, the Court, I'm Robert Gulley from the Department of Justice, here on behalf of the Environmental Protection Agency and the United States Fish and Wildlife Service. Let me begin by trying to address, I believe, some of the questions that were addressed to the Petitioner's Council. And I think it's important that you make two distinctions. There's the question of the duty to consult, the duties that arise under 7A2, and that's the question of whether it's a federal action as defined in the statute. By regulation, the Fish and Wildlife Service has said that the requirements of Section 7 are limited to actions in which there is federal discretion or control. Now, now, does the EPA have a position on whether that position is consistent with the statute and was TPA versus HAL? It's not lucid to me that it is. It's not been briefed in this case. It has not been briefed in the case. It has been raised, however, in the reply brief, which is the first time it could have been raised. The question of the validity of the regulation has been raised in the reply brief after the interveners, but not the EPA, tried to rely on that regulation. I believe that it was raised in the context of whether, indeed, EPA had discretion that required it to consult. I don't believe that there was a question of whether the regulation was valid or not. At least in passing a footnote saying that if you think there isn't discretion, then the regulation is invalid. In any event, do you have a position on it as a question? Well, we do not have a position other than the fact that we obviously believe that the regulation is within Fish and Wildlife Service. But why do you believe that? You're representing the EPA. You're also representing Fish and Wildlife Service. Well, this is on the issue of whether they have an obligation to consult, and we haven't taken it. We believe the regulation that says that limits the scope of the term federal action to only actions in which there is some discretion, we believe that that regulation is valid. Okay. That's the government's view. The question of whether EPA has discretion under the statute requires it to consult, and that we have not taken a position on. But you did take a position in the Fifth Circuit case. We took a position in the Fifth Circuit that we indeed had discretion. Yes, we did. Oh, you haven't taken a position. But now that the American Forest Paper decision has come out, we have not revisited that. And the reason we haven't revisited that is that through the national MOA and actually before the national MOA, Fish and Wildlife Service and EPA and the National Marine Fisheries decided that EPA agreed that it would consult on the approval of state programs. But then we have a situation where you consulted and there's a challenge to your consultation as being inadequate. And if we were to agree that the consultation was inadequate, if it was necessary, then we have to answer the question of whether it was necessary, don't we? Your Honor, we consulted. It's an action. We committed to take that action. I don't believe you have to reach that. We have consulted. I think, therefore, that if we concluded that you inadequately consulted, then they win and you lose. Excuse me? Then they win and you lose. You would have to remand the consultation and for us to take a look at it. During the course of that, we may well consider the issue as to whether we're going to continue our position about consulting and take a position on the American Forestry paper. So there's the question of the federal action and the obligation to consult. That's largely what was discussed here. But there's a second issue, and it's very distinct. Once you have consulted, you have to consult on the direct and indirect effects of the action, okay, not all the direct and indirect effects of the action. But the question is, is the fact that Arizona does not have to consult, is it an indirect effect of the approval of the project? And the term indirect effect is a term of art. It was based in the National Wildlife Federation versus Coleman back in 1976 when the Fifth Circuit in that case found that Fish and Wildlife Service had not looked at all the effects of the actions because it didn't consider development. And it said you have to consider development. This was for a highway project. They were building a highway. And they said you have to consider development. Even though you aren't doing the development, you're just building the highway. And the reason is that you have control over that development because you control where it's located by where you put the highway and where you put the interchanges. You put an interchange here, the gas stations, the shopping things will come there, okay? And so they said because you have control over that, you have to consult on that indirect effect of the action. And this was translated into a regulation in 1986 by Fish and Wildlife Service. And what the regulation says is that an indirect effect is an effect that is caused by the action but occurs later in time and is reasonably certain to occur. This is the crux of the case today because what Fish and Wildlife Service determined was is that the loss of consultation, the fact that there would be no Section 7 consultation by the State was not an indirect effect of the action. And that's important because it's not an indirect effect. But isn't that equivalent to saying it seems to me that on this point your opponent is correct, that your position with regard to that is the same as the position that you don't have to consult because you're saying that you don't have to consult about the transfer because you don't have any discretion about the transfer. Isn't that basically what you're saying? No. That's not what we're saying, Your Honor. We do have to consult. And through that process ‑‑ But the consultation resulted in really a legal decision, not a scientific decision. As to your reason why you said that you didn't have to ‑‑ that this was an indirect effect was a purely legal conclusion. It didn't have anything to do with any scientific investigation. Well, it was indeed ‑‑ it was indeed largely legal or policy-based, because the question of whether the loss of Section 7 consultation was an indirect effect is largely legal and policy-based because you're looking at issues of causation and reasonable certainty of concern. And ultimately, it's a statute. The reason that you're ‑‑ as I understand it, that you're saying that it isn't an indirect effect is basically because you had no control over it, because the statute said it, not you. Isn't that what you're saying? Well, because the statute said that we must approve the program if the criteria are met. Right. And it also said that there's no Section 7 consultation after the transfer. Yes. Therefore, it's a result of the statute, the nondiscretionary statute, and not of us. So it's the same as the discretion issue. Well, except we're doing it in the consultation, and there are other considerations that come out through the consultation. As you've pointed out, through the consultation, the MOU was indeed refined. The discussions occurred with the State. Out of that came the SMART NOI, because the State, because Fish and Wildlife Service and EPA, they talked to the State, and they wanted to make sure that this process that the MOA contemplates is effective. The State agreed. They set up a computer system in which the computer will instantly identify whether the projects in an area where species occur will then kick back and say ‑‑ But isn't it true that if you had done the ‑‑ a truncated version of the consultation and simply said, if the BO had said there's no indirect effect because the statute requires this result, and you said, oh, yes, the statute requires that result, according to you, you would have fulfilled your obligation at that point, because there was no indirect effect. There was nothing to consult about. In this case, I think you're right. In this case, the issue was the effect of the loss of Section 7 consultation, an issue that hasn't come up in any of the other consultations that have taken place. Okay? But, yes, you're right. In this case, because there were no other circumstances, that could be different, for example. The only case we have before us. Yes, but I'm answering the question that there could be circumstances, such as if there were a species of fish that resulted in water quality. There could be circumstances where the fact that we went through the consultation and made that consideration could be of value. In this case, it did not. And that's the important part, is if it's not an indirect effect, the loss of Section 7 consultation, then it does become simply a ministerial and administrative transfer, taking the authority from a Federal sovereign and transferring it to the State sovereign. Taking a program that is a Federal program and imposing an equivalent or perhaps even more stringent State program. And in this case, that is indeed what happened. But that doesn't say that in every circumstance that would be the result of consultation. You're not saying, to go back to the dialogue we were having earlier, in this instance, most of the permitting is about construction, right? Yes. So it's not simply indirect in the sense that if you needed water to build a project, if you didn't have the water, you wouldn't have the project, sort of like the highway example. This is much more direct than that because it's really the construction runoff that the permits are about. Yes. But it is more attenuated. If the Federal Government is issuing the permit, it is limited, though, only to controlling the discharges. It can't go up and tell the developer what to do with its upland activities. As a practical matter, there's not going to be any upland activity if the permit isn't issued, right? And that's really why this has turned out to be a very powerful way of dealing with endangered species. It's a practical matter. Isn't that true? You can deal with situations where there's no discharges. There are cases that I'm aware of where I've actually dealt with permits years ago where they would design systems so the runoff would never get to a water of the United States. It's conceivable. But, yes, but as a general matter, as a general matter, the many developments need these construction general permits in order to be able to operate. And, therefore, my understanding from the record is that it really has made a big difference in the past, that EPA has been able to condition these permits on protections for endangered species. And there's no doubt about that, right, that that's possible. There's no doubt that Fish and Wildlife Service has been successful in making changes, and making a difference in getting habitat preserved through the consultation process. I think there's probably some question as to whether all the projects were construction projects and whether some of the measures that were implemented were more voluntary rather than the result of, in fact, I know this, EPA could not impose them as a term of the permit. Just to clarify my thinking on this, apparently the Clean Water Act specifies that if nine certain requirements are met, the EPA shall transfer the program to the State. And does everybody agree in this case that the nine criteria were met? There has been no information provided arguing that the nine criteria have not been met. So if we proceed on the basis that the nine criteria are met, that the EPA shall then approve the programs and make the transfer to the State. And that has occurred here. It has transferred this program to the State, as I understand it. Only the Federal Government can require Section 7 consultation. The State cannot. So the result of the transfer would certainly be there will be no Section 7 consultation. Is that correct? That's correct. But if the nine criteria are met and the Clean Water Act prevails, then that really doesn't make any difference, does it? So what? So if you've complied with the statute and done what the statute requires you to do, by this I mean the Clean Water Act. Yes. Then why are we all arguing about Section 7 compliance or consultation and a loss thereof? The statute required the loss thereof, as I understand the Clean Water Act. I think that's true. The statute required the loss thereof. But we are talking about it because we consulted. And during that process, because we did it anyway. You did something you didn't have to do. We consulted. Whether we had to or not, we haven't taken a position on that. Do you want some benefit to come out of it? Well, we think there is some benefit out of it, you know, for the reasons that I've articulated. There were some benefits out of it. You did that in connection with determining whether the nine criteria are met. Well, I think that's what – excuse me. Then I misspoke. I think in determining whether the nine criteria were met, we consulted with Fish and Wildlife Service, and we believe we obtained some benefit. It is possible that under some circumstances that I can't necessarily describe for you now, that there could be other problems and that the consultation would have other benefits. Once those nine criteria are met, you've crossed the Rubicon. Now you've gone to the point where you then transfer. And now it's up to the State to go forward with the program. Yes, that's correct. I've run out of time, and I don't want to deprive the interveners. We'll give them the eight minutes anyway. Excuse me? We will give them the eight minutes in any event. The one that – I have other points to make, and I'm glad to talk as long as you'd like me to. License to continue further. I won't take it as one either. I do want to answer one question you asked about the funding mechanism. The funding mechanism flows from 106 of the Clean Water Act, I believe. And this is a generic grant that is a pot of money that Congress has allocated that is divided up on a formula and that it's allocated among all the states that have NPDES programs. It is used not to fund specific projects or specific actions. It's simply used to fund things like personnel, I think some travel. It's a generic pot of money that's allocated according to some formula. And is this something that's given out according to a grant proposal and as to which there's discretion in that regard? This issue was not briefed. It was not argued. But I believe that my understanding on this is that there is certainly some information that you have to mail in your coupons. You can't just – you don't just get a check. But I believe that there is a strict formula for how this is generated. And I do know with some certainty that it's not based on – it's used only for the limited purpose of personnel and some other types of administrative costs. It's not – they don't fund it in order to get them to go out and permit X or examine Y. It's simply a broad administrative funding. All right. Thank you, counsel. All right. We'll give eight minutes to the interveners. Thank you. May it please the Court. My name is Norman James. I'm with the firm of Fenimore, Craig, and Phoenix. And I'm representing the Home Builders Associations today. I will talk for approximately three minutes, Your Honors, and cede the remaining time to my colleagues. And I want to say initially I appreciate the fact that this is an unusual argument, and I appreciate the fact that you're letting us address the Court as well. I want to address very quickly in my three minutes of fame here a couple of points that have come up in connection with the argument. And first, Judge Berzon, I'd like to respond to a couple questions that you had asked, albeit somewhat indirectly. But just looking at the consultation process, there seems to be a bit of confusion. Judge Berzon, you had indicated that when you read the biological opinion, you thought it read like a legal opinion as opposed to a scientific document. I think what needs to be kept in mind here, there are roughly 60 listed species in Arizona. The vast majority of those species are things like nickels, turkhead, cactus, and the Kanab amber snail. They're species that are found in remote locations on federal land that aren't affected by these permit programs. And under the Endangered Species Act, under Section 7, there is a consultation hierarchy, if you will. Agencies aren't required to consult when the federal action they're proposing has no effect on listed species or designated critical habitat. In fact, there's an example, actually. There's a decision in the related litigation, Defenders of Wildlife v. Flowers. There's an unpublished opinion that's attached to Mr. Gulley's brief that deals with this no effect call concerning the pig male on a particular project. You get to the next level, may affect but not adversely affect. Many of the species are in that category in this case. As you recall, the record is very clear that there's no dispute that the state taking over permitting authority will have no effect on aquatic species. That's a may affect not adversely affect call. That's normally handled through what's called informal consultation, which is reflected in the Fish and Wildlife Service's regulations. I believe the site is 402.13. Again, no formal biological opinion is needed. So finally you get to the point of may affect, likely to adversely affect. That's the trigger for what's called formal consultation and results in a biological opinion. Now, if you look at the cases that have come out of, particularly out of this circuit, virtually all the cases involving Section 7 issues deal with federal actions, federal projects, a federal timber sale, a water project that's administered by the Bureau of Reclamation, federal water contracts related to that project, et cetera. What's unusual, Your Honors, about this case, and this leads to what I want to focus on today, and that's this loss of conservation benefits. That's good because you've used your three minutes, so you better get to what you want to focus on. I'm sorry. But what I want to, all I want to say with respect to that is contrary to what opposing counsel said, I think there is a disagreement about whether there were true conservation benefits being produced prior to the transfer of permanent authority, as we've explained in our brief. If you look at the biological opinion. What is your argument ultimately? There didn't have to be a consultation or the consultation was fine or what? We agree with the position that's been taken by the other interveners that consultation was unnecessary. But I also think the consultation was fine because there isn't a loss of conservation benefits, primarily because EPA, while it has broad authority to regulate discharges of pollutants, doesn't have authority to regulate upland construction activities. So you're saying there didn't have to be a BO, and therefore the fact that it was a very odd one doesn't matter. I'm just saying it's really specific. And that's what I'm going to do, and I'll sit down. What I'm saying, and that's why I was giving the introduction, which again took too long, the real issue is aquatic species. Clearly EPA has jurisdiction when it issues permits regulating discharges to take into account aquatic species. There's no dispute, however, with Fish and Wildlife Service in this case. Isn't this really the issue in the other case, the one that we severed and sent off? Basically, or at least one of the issues. Well, it's one of the issues. Well, yes, the scope of the effects analysis. The home builder's position, Judge Berzon, is very simple, that EPA doesn't permit home building or other construction activities. They authorize discharges of pollutants. But the pollutants are specifically from the construction. That's why I'm having a very hard time with this argument. If the construction is in the uplands, but runoff is wherever it is, you have to have a permit, right? I have to have a permit to discharge. If I don't discharge, however, I guess I would approach it from the- That's true. If you don't discharge, you don't have to have a permit. That's right. If you have a discharge, because you do have to have a permit, and you can't build the whole project, and therefore the entire project seems to be at issue. But that really seems quite to the side of this case anyway. Okay. Well, I'll sit down then and see the remaining time. Thank you. All right, counsel. Now we've got five minutes. We'll give the rest of you. Is it only you or two of you? It's me and Mr. Stark. Can I suggest that this is really a silly way for you to be arguing? This is a really complicated, hard case. And if you had gotten together and made some agreements about who was going to argue in a coherent argument, you would have done yourself a bigger favor. But go ahead. Thank you, Your Honor. This is why the Supreme Court does not allow divided arguments. My name is Russell Fry, and I'm representing what we've called the industry intervenors. And part of the reason I'm here is because I was counsel on the AFPA case in the Fifth Circuit. Is Hartman here by any chance? Yes, he is. Okay. Well, I just want to be sure we're going to hear from him. Yes, we will certainly, right after me. I want to talk about four things quickly that were raised earlier, and I'd just like to clarify. First of all, TVA Hill did not dispose of the discretionary action issue. It had nothing to do with discretionary action. It's somewhat informative and evocative. It certainly wasn't dealing with it directly. Well, it had some provocative language. I didn't say provocative. I said evocative. This circuit in National Wildlife Federation v. Burlington Northern has said you can't expect too much out of that language. And certainly both the Fifth Circuit in the AFPA case and the D.C. Circuit in the Platte River Whooping Crane case have said TVA Hill does not mean that agencies are given authority to do something that they weren't given by Congress in their own statute. Secondly, the validity of the regulation that's been mentioned, the 50 CFR 402.3, that says it only applies to discretionary federal involvement or control, should have been argued. It shouldn't have come up in the reply brief. That regulation is pivotal. Well, excuse me. It came up in the reply brief, as I understand it, in a quite logical fashion, because his position was that the consultation was inadequate. The EPA's position was that they did consult. So until some interveners came in and argued that there didn't have to be a consultation at all, he had absolutely no reason to be discussing this question. Well, Your Honor, actually in the motion to consolidate, in response to his motion to consolidate the district court appeal with the petition for review under the Clean Water Act, we argued that the two shouldn't be consolidated because there was no discretion under the Clean Water Act to. Well, he still didn't have a brief that made an argument, and he didn't have to. At that point, his opposing party was the EPA, and the EPA wasn't taking this position. Well, Your Honor, I think this identifies a problem with this case. This case is a petition for review that is in this Court because Congress said in Section 509 of the Clean Water Act, actions under the Clean Water Act go directly to this Court. And yet, Mr. Senator never even mentioned as an issue presented for review in his brief that EPA had failed to comply with the Clean Water Act. So it should have been briefed in his opening brief, and he has never even asserted. I don't understand him now to be taking the position that EPA failed to comply with the Clean Water Act. I'm sorry, I don't understand that. I'm sorry? I do not understand there to be any issue in this case about whether EPA complied with the Clean Water Act. The question is whether EPA complied with the ESA, but the question is whether the Endangered Species Act applies to nondiscretionary actions, and also whether this is a nondiscretionary action. I think you're right. That is an issue in this case, and it was not briefed in the petitioner's opening brief. That was my point. If I may, two other points. The Fish and Wildlife Service-EPA Memorandum of Agreement already spells out the terms of cooperation between Fish and Wildlife Service and EPA. There was no need for a subsequent agreement after consultation. And if you look at 66 Fed Reg 11216, which has been cited, that specifies how Fish and Wildlife Service and EPA, going forward, will consult on state-issued NPDES permits. If this Court were to overturn EPA's approval of the state program, which is what this case is about, which is why it's in this Court, it would not only be substituting its judgment for the government's opinion about what EPA was required to do, which, by the way, even the regional office of Fish and Wildlife Service said there wasn't any dispute that there was no option to disapprove the Arizona program. This Court and at least four other circuits have said EPA had a mandatory duty to approve the state program. This Court, including Judge Thompson's opinion in the Environmental Protection Information Center case and the Margaret Muralet v. Babbitt case, has said that where there isn't an option for discretionary action, there's no action that is subject to Section 7 restrictions. The Fifth Circuit has directly said that the Clean Water Act and the Endangered Species Act does not allow the addition of additional criteria to satisfy ESA requirements. We've got five minutes out of the eight on this argument. You had, well, we're going to give an extra three minutes to your final intervener, but we've used ten out of the eight already. So thank you, counsel. Thank you. May it please the Court, I am James Skarden of the Office of the Arizona Attorney General. For the intervener, State of Arizona, it is our program that is at stake here. We believe we have used that to increase the protection of our surface water through increased resource allocation, inspections, and other matters in the record. It is also the clear intent of the Congress, when it passed the Clean Water Act in 1972, that the states run the program. That's right in Section 101B. Once the criteria of 402B are met, the transfer is mandatory. Just for a minute, in terms of the criteria, the criteria aren't that specific. I mean, there's a certain amount of room, presumably, for the agency to interpret those criteria and to apply them, right? And I notice that the Fifth Circuit did suggest that within the application of the criteria, there is discretion in the agency. Do you so why isn't that a sufficiently discretionary decision to trigger EPA consultation? I don't know, actually, remember what your position is. Well, I would take it back to what this Court has indicated in Sierra Club v. Babbitt. There is discretion, but is it discretion to act on behalf of endangered species? And as I have seen the criteria, they involve compliance with the provisions of the Clean Water Act only. Your position is this is not a discretionary decision such that it triggers any EPA responsibility. That's correct. That's our position. Forty-four states have gotten this transfer of authority before us. But my understanding is EPA has done the consultation before. It is my understanding that they have begun to do so in recent years. If it had been a factor in the past, I would think we would have a number of decisions instead of just the American Forest decision, which said it was not necessary. Well, no, it didn't really say that. I'm sorry? It didn't actually say that. It never really reached the question. It said that you couldn't condition the approval on additional criteria, but it didn't answer the question of whether the consultation was required. I'm sorry. I misspoke. It did indicate in the footnote that it was beside the point of the case, because there was no power to act on behalf of endangered species. There is one we have 44 states that have this. We would be the 45th. If the Petitioner's position is valid, in my view, it would call into question as to whether some or maybe even all of the previous 44 delegations of authority were wrongly decided under the law. If the Endangered Species Act is supposed to have the effect, Petitioners say it does. We say it does not for the reason stated, that there is no discretion under Sierra Club v. Babbitt, which this Court issued. One final point, briefly. I'm told this case is part of the record. It's Department of Transportation v. Public Citizen, U.S. Supreme Court case, 124 Supreme Court Reporter 2204. At page 2217, there is a quote Mr. Gulley pointed to me. We hold that where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant cause, quote-unquote, of the effect. That ties into the direct and indirect effect arguments. But to me, it backs up our main point. We have the right to our program. We have the right to protect our water and administer our surface waters. We met the criteria. Nobody disputes that. So we're entitled to the program. Thank you. Thank you, counsel. I think we were going to give you a couple of minutes. Actually, just three points. If I could come back to the issue of language of Section 402B, and I think another way of putting what I believe the interveners are arguing here is that, in effect, what that language has done is waived the requirements under Section 7, both from the standpoint of Language, yes, I'm sorry. The 402B language that says if the nine criteria are met, EPA shall transfer the program. Another way of saying I believe what the interveners are arguing is that that language, in effect, has waived both the obligation to consult as well as the substantive obligation. But wasn't the Clean Water Act first? I believe it was in 72. I believe it was in 72. It has been amended since. Doesn't the EPA, in determining whether the nine criteria have been met, don't they do something there? Don't they do some consulting or whatever? Or do they just do nothing? I mean, is that the protection that you're looking for? Consulting with the Fish and Wildlife Service? I don't know. There must be something to determine whether these nine criteria are met. Well, they take public comment. I mean, it was EPA's position before the Fifth Circuit that they, in fact, did have discretion in determining whether or not those nine criteria were met. And, in fact, it was their argument that because of that, this, in fact, is a discretionary obligation. And under the Fish and Wildlife Service's regulation, therefore, they had to consult. And I think that's precisely why they have now been consulting with the Fish and Wildlife Service. If I can come back to the Clean Water Act language, one thing that I think is worth noting is, and we didn't point this out in our brief, but I'll just bring this to the Court's attention, is the Clean Water Act, Section 1371C, has a fairly broad NEPA waiver. And I think that says a lot here from the standpoint of Congress obviously knows how to waive other environmental statutes with respect to EPA's administration of the Clean Water Act. They didn't do so with regard to Section 7. So I — Because there's nothing to be waiving. Your arguments are really confusing me, because if there — if this was a nondiscretionary statute that says you shall transfer these nine criteria met, then what was there to waive? But that's precisely the point. Congress felt the need to go ahead and explicitly waive the application of NEPA. They didn't do so with respect to Section 7. So the implication is that Section 7 fully applies. And if I could just put a point on this. And to bring this back again to I think the issue here with respect to what the interveners were arguing, if EPA's decision to transfer this program, which is precisely what we have here, is determined to result in the extinction of listed species, if TBA versus Hill stands for anything, they cannot go ahead and undertake that action. There is a provision they could invoke the God Squad to seek an exemption, but there is no exemption under Section 7.8.2 for so-called nondiscretionary duties. And there is certainly no exemption outside of the God Squad for Federal actions that result in the — I'm sorry? What's the God Squad? The God Squad is the Endangered Species Committee. After the TBA versus Hill issue, Congress explicitly amended Section 7 to provide for a process for Federal agencies to actually obtain a waiver from the Prohibition on Jeopardy. As to the substantive requirements, but not as to their consultation requirements. Yes. Is that right? Yes. It fundamentally goes to the substantive requirement. Because my understanding is that it's essentially invoked at the end of a consultation process. Just one other point. Back to the biological opinion that Mr. Gulley argued that in terms of defending the BO, that it did meet the agency's own but-for test. And I'll just read from the BO. This is an excerpt of Record 223. It says, put another way, the action must have been a substantial factor in the occurrence of the effect. In quotes, the loss of conservation benefit for it to meet that but-for test. I see no way how the Fish and Wildlife Service could have concluded that EPA's action was not a substantial factor. It was the only factor that caused the loss of Section 7 conservation benefits in this case. All right. Thank you, counsel. Thank you. The case just argued will be submitted. The Court will stand in recess for the day. All rise. This Court for this session stands adjourned.
judges: Reinhardt, Thompson, Berzon